## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ERIC LYONS,** | : | **Civil No. 1:13-CV-2952** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **JEFFREY BEARD, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## REPORT AND RECOMMENDATION

## I.      INTRODUCTION

This is a *pro se* lawsuit brought by Eric Lyons, an inmate in the Pennsylvania Department of Corrections, currently housed at the State Correctional Institution at Dallas.  Lyons, who is serving a lengthy sentence for a number of violent criminal offenses, including attempted murder and rape, is a repeat litigant in this court, where he has previously sued a number of prison officials in furtherance of what has become a longstanding series of related complaints regarding his extended placement in Administrative and Disciplinary Custody, his maintenance on a Restricted Release List (RRL) and his alleged deprivation of certain personal property, including television and radio privileges. Lyons alleges that a number of prison officials individually and collectively retaliated against him, or otherwise discriminated against him, by denying him

privileges and preventing his release to the general prison population.[1]  Since this lawsuit was initiated, it appears that Lyons has enjoyed access to much of that property, and has likewise been returned to the general population at SCI-Dallas.[2]

The defendants[3] have moved for summary judgment on all of Lyons's claims, on both procedural and substantive grounds.  Upon consideration of the parties' briefs and the record evidence submitted, we find that Lyons's current iteration of his grievances fail as a matter of law, for lack of evidentiary support, and most fundamentally because Lyons failed properly to exhaust these claims in accordance with a grievance process with which he was unquestionably familiar.

---

[1]  Since this lawsuit was initiated, it appears that Lyons has enjoyed access to much of that property, and has likewise been returned to the general population at SCI-Dallas.  As will be discussed, Lyons's initial placement in administrative custody appears to have been made largely because the nature of his crimes which involved the kidnapping, sexual assault and attempted murder of a child, put Lyons and the institution at risk for violence, and his continuation in restricted housing was subjected to periodic reviews by the Program Review Committee (PRC) at SCI-Dallas.  Lyons also spent time in disciplinary custody, which was imposed after Lyons was found to have violated institutional rules.  It appears that by the time the motion for summary judgment was filed, Lyons had amassed over 180 misconducts during his time in DOC custody.

[2]  Lyons's claims bear some resemblance to those that he brought in earlier litigation in this court, which were also animated by complaints over being denied television and radio privileges in his cell.  The claims in that case apparently were resolved by the parties and the litigation was dismissed without prejudice.  *Lyons v. Wetzel*, 1:12-CV-1357, 2012 U.S. Dist. LEXIS 129888 (M.D. Pa. Sept. 12, 2012).  The claims in this case, which also touch upon Lyons's contention that he was unreasonably denied access to personal property and was subjected to unjustified administrative housing and restricted release categorization are, this time around, packaged somewhat differently and presented under different theories of constitutional violations.

[3]  The remaining defendants are Michael Klopotoski, the Deputy Secretary of the Pennsylvania Department of Corrections; Jerome Walsh, the Superintendent of SCI-Dallas; Michael Damore, the DOC Staff Assistant for the Eastern Region; Norman Demming, the Deputy Superintendent for Centralized Services at SCI-Dallas; Lawrence Mahally, the Deputy Superintendent of Facilities Management at SCI-Dallas; and Vincent Mooney, the former Deputy Superintendent of Centralized Services at SCI-Dallas.

Accordingly, for the following reasons it will be recommended that the defendants' motion be granted, and the case closed.

## II.   <u>BACKGROUND</u>

### A. Factual and Procedural History

Lyons alleges that he has been held in solitary confinement, on AC status, and placed in an RHU, since he was taken into custody at SCI-Camp Hill in 2003.[4] (Doc. 1, Compl. ¶ 1.)  He claims that his placement into restricted custody and his designation on the RRL was not the result of institutional misconduct, but instead was because of the nature of Lyons's crime of violence against a young child, and to "deprive [him] the liberties of interacting with other inmates in general population or accessing items of [his] personal property and privileges as other prisoners."  (*Id.* ¶ 2.)  Lyons claims that his custody has remained restricted throughout his incarceration, and that it became permanently so as of May 14, 2008, when the Department of Corrections instituted an RRL to be applied to those inmates deemed to pose a threat to the secure operation of a correctional facility,

---

[4] Lyons is currently serving a lengthy sentence that was imposed following his "2002 conviction for the kidnaping, rape and attempted murder of an 8 year-old girl." *Lyons v. Beard*, 3:07-2278, 2011 U.S. Dist. LEXIS 55189, 2011 WL 2036505 (M.D. Pa. Feb. 11, 2011), *report and recommendation adopted*, 3:07-CV-2278, 2011 U.S. Dist LEXIS 55183, 2011 WL 2015511 (M.D. Pa. May 24, 2011), *aff'd sub nom., Lyons v. Sec'y of Dept. of Corr.,* 445 F. App'x 461 (3d Cir. 2011).

and where a transfer of that inmate to another institution would not alleviate the security concern that gave rise to the placement.[5]  (*Id.* ¶ 4.)

Lyons claims that in or around the time that defendant Wetzel assumed his duties as Secretary of the Department of Corrections, he did away with a number of restrictions that had been placed on RRL inmates, and provided these inmates with "some expectation" that they could earn the possession and use of their personal property, including phone calls, televisions, radios, and typewriters, and that they might also be able to earn release into general population.  (*Id.* ¶¶ 18-20.) According to Lyons, although staff at other DOC facilities began providing these privileges to RRL inmates, defendants Walsh, Demming, Mooney, and others were "against" applying these procedures at SCI-Dallas, where Lyons was transferred in or around September 30, 2011.  (*Id.* ¶ 22-23.)  Lyons claims he arrived at SCI-Dallas with some period of disciplinary custody left to be served for some unspecified misconduct, but when this time expired, he was nevertheless kept on both AC and RRL status, and continued to be deprived of his personal property, despite his requests to numerous individuals that these asserted rights be restored to him.[6]  (*Id.* ¶¶ 24-35.)  Lyons filed requests, letters, and finally formal grievances

---

[5] Lyons's complaint includes a number of allegations charging former Secretary Jeffrey Beard of violating procedural rules governing the placement of inmates on RRLs, but these claims have been dismissed and are not repeated here.

[6] Much of this dispute seems to have been between Lyons and staff over his desire to have a television in his cell, which he proposed to outfit with a digital antenna made of "unbreakable plastic," (Compl. ¶ 30), which Lyons hoped to use in order to "receive over-the-air stations."

in an effort to secure his television and other property, but he claims that these requests and grievances were intercepted, ignored or otherwise denied, perhaps as part of a concerted effort by prison officials to deprive Lyons of any measure of due process. (*Id.* ¶¶ 35-40.)

Lyons also recites discrete portions of his extensive litigation history, observing that he had filed either a grievance or a prior lawsuit against one or more of the defendants in 2012, asserting his view that the "conditions of confinement imposed atypical and significant hardship on [him] in relation to the ordinary incidents of prison life; that it denied [him] procedural and substantive due process; that it biasly [sic] deprived [him] of [his] stored property contrary to similarly situated inmates; that it denied [him] equal protection of the law; and that [he] was retaliated  against for exercising use of the grievance system." (*Id.* ¶ 42.) Despite receiving no responses to his repeated requests and assertions, Lyons persisted in providing "proposal[s]" to Secretary Wetzel, who in turn never saw these proposals because they were intercepted and discarded by other DOC staff, including defendant Damore. (*Id.* ¶¶ 46-50.)

---

(*Id.*)  Lyons claims officials denied his request, citing a lack of cable in the cell, and because they believed that Lyons would be unable to receive any stations using his antenna.  Lyons's "firm position was that [he] was not even being given the opportunity to try to get stations with the antenna . . . ." (*Id.* ¶ 34.)  watch television "over-the-air" using an "unbreakable plastic" antenna while in AC. Thus, much of this lawsuit seems to be inspired by Lyons's frustrated desire to watch television "over-the-air" using an "unbreakable plastic" antenna while in AC.

Lyons claims that in August 2012, he spoke with defendant Klopotoski, and again requested access to his television set as other RRL inmates had been provided once they satisfied certain criteria. (*Id.* ¶ 52.) According to Lyons, Klopotoski responded that he was aware of a pending lawsuit that Lyons had filed against him, and that he did not "see that as being acceptable behavior," and told Lyons he would not have his property "for a long time to come" because of the lawsuit. (*Id.* ¶¶ 53-55.)

In July 2013, Lyons had occasion to speak with Wetzel, Klopotoski, Walsh and others during a tour by prison officials at SCI-Dallas. Lyons claims that during this time Wetzel claimed to have no knowledge of Lyons or his custody status, and said that he had never received any correspondence from him. Lyons claims that during this meeting, Wetzel asked Walsh if he would approve of Lyons being removed from the RRL and placed in general population, and Walsh said he did not have any objection. This inspired Wetzel to instruct Walsh to give Lyons his television if he complied with DOC policies and procedures. Lyons claims Wetzel also promised to review Lyons's file to consider release from the RRL, but that Wetzel never did so, and that Walsh never gave Lyons his television. (*Id.* 56-69.)

Lyons claims that afterward, on August 9, 2013, Walsh summoned Lyons to a meeting where he "suggested that [Lyons] seriously think about what Klopotoski

had said to [him] about [his] tv on 8-31-12" – which Lyons interpreted to mean that if he wanted his television, he needed to drop his lawsuit.  (*Id.* ¶¶ 70-76.) Lyons apparently did seek to have a lawsuit dismissed without prejudice, and once this occurred, he informed Walsh, and on September 5, 2013, Lyons was provided his television which, "contrary to the previous conjectures and assumptions" made by the defendants, Lyons "was able to get 19 over-the-air channels with [his] digital antenna." (*Id.* ¶¶ 77-79.)

Following the restoration of his television privileges, Lyons found himself embroiled in another dispute with his jailers, this time over the sequestration of some of his funds earned from a prison job, which was allegedly used to pay down institutional debts that Lyons had incurred.  As part of this dispute, Lyons wrote to Wetzel, essentially seeking to quit his job in order "to seek resolution from a legal standpoint," but this letter was intercepted by defendant Damore, who allegedly threatened Lyons by saying "it would be a shame for you to lose [your TV, radio, phone calls, etc.] due to reverting back to old behaviors which have not worked for you in the past." (*Id.* ¶ 80.)  Lyons interpreted this as a renewed threat that he would be retaliated against if he quit his job and sought to bring new lawsuits against prison officials. (*Id.* ¶ 81.)

Notwithstanding this incident and Damore's alleged threat, Lyons did quit his job, and was once again deprived of his television and his radio "as a result of

bogus misconducts received after [he] filed grievances against staff for assault, destruction of [his] property and retaliation for using the grievance system." (*Id.* ¶ 82.)  Lyons claims that this lawsuit is now the only remedy available to him to resolve what he perceives as longstanding and pervasive constitutional deprivations.

Lyons asserts that his long-term isolation in administrative custody, and on the RRL within the SHU at SCI-Dallas constitutes an atypical and significant hardship that amounts to a violation of substantive and procedural due process, as well as violations of his right to equal protection and to be free from retaliation for exercising protected First Amendment activity.  Lyons also claims that Wetzel has failed to follow DOC policies and procedures and has been deliberately indifferent to Lyons's "rights and liberties." (*Id.* ¶ 84.)  Lyons also claims that defendant Damore has retaliated against him by intercepting correspondence to defendants Wetzel and Klopotoski, and by threatening further deprivations if Lyons persisted in bringing litigation against DOC officials and prison staff.  (*Id.* ¶ 85-87.)  Lyons also brings an Equal Protection claim under a "class of one" theory, alleging that he is singularly being treated differently, and more harshly, than other inmates in the SHU, on AC and the RRL.   Lyons seeks declaratory and injunctive relief to stop what he perceives as violations of DOC policies, and he seeks compensatory and punitive damages.

The defendants previously moved to dismiss many of the Lyons's claims. The undersigned prepared a report and recommendation that recommended granting that motion in part. Following that recommendation, the district court entered an order dismissing all claims that had been brought against former defendants Wetzel, Kazarauskas, Gandy, Maye, Mosier and Pall. The court left in the case Lyons's claims that the remaining defendants' deprivation of his personal property constituted unlawful retaliation, but without prejudice to the defendants' efforts to dispose of these claims on summary judgment if warranted, since the defendants had largely ignored the plaintiff's legal theory underlying these claims in their motion to dismiss. The court also left in place claims against certain defendants, including Walsh and Klopotoski, whom the defendants had suggested lacked personal involvement in the alleged constitutional violations, but did so because the defendants had previously urged the court simply to take judicial notice of the purported fact that supervisors could have had no involvement in the matters complained of, something that the court found unwarranted at that time.

## B.     Lyons's Housing History at SCI-Dallas

Lyons was transferred to SCI-Dallas on September 30, 2011, the institution where he was housed at all times relevant to this action, and the prison from which Lyons filed this lawsuit on December 9, 2013. (Def. SMF ¶¶ 21, 22.) As noted, for much of his incarceration, Lyons has been subjected to different degrees of

restricted housing, either by being kept in administrative custody (AC) on the RRL because of concerns about his own conduct and the risks he presented in general population as a result of his criminal background; or in disciplinary custody (DC), which was periodically imposed after Lyons was adjudged to have violated prison rules repeatedly.  The evidence shows that an inmate may be placed in AC status and housed in a Security Level 5 Housing Unit (RHU) for any of several reasons, including where he is a danger to others or in danger from others, and where he completes DC time and these reasons also exist.  (Doc. 80, Def. Appendix at A, DC-ADM 802, p. 1-1.)  An inmate may be placed on the RRL where he poses a threat to the secure operation of the facility and a transfer will not alleviate the concern.  (*Id.*, pp. 1-2.)  An inmate on the RRL cannot be released from the RRL without approval from the Secretary.  (Def. SMF  49; Appendix at A, DC-ADM 802, p.4-2.)

When Lyons arrived at SCI-Dallas, he was serving a period of disciplinary custody that was imposed after Lyons was found guilty of violating prison rules at another institution.  At times in his brief, Lyons seems to dispute this, but only to argue that the defendants have not presented him with sufficient documentary evidence that proves he was so classified upon arrival.  The defendants have, in fact, provided the court under seal records from the PRC that demonstrate that Lyons was subject to disciplinary custody upon arrival, and an overview of his

disciplinary custody that reflects scores of misconducts on persistent concerns over Lyons's assaultive history and refusal to comply with institutional rules as a basis for imposing disciplinary housing.  (Doc. 81.)  Lyons's ostensible efforts to create an issue over his disciplinary status upon arrival at SCI-Dallas in 2011 are unavailing and, moreover, essentially irrelevant to this dispute, despite Lyons's apparent interest in re-litigating numerous aspects of his confinement dating back roughly five years.

To complete this disciplinary sentence after arriving at SCI-Dallas, Lyons was held in DC status from September 30, 2011, until December 9, 2011.  Upon his release from disciplinary custody, Lyons remained in AC status and subject to the RRL from December 9, 2011, until October 31, 2012.  (Def. SMF ¶ 58-59.) Lyons was adjudged guilty of additional misconducts and was ordered back onto DC status from October 31, 2012, until January 14, 2013.  (*Id.* ¶ 60.)  After he had served this period of disciplinary custody, Lyons returned to AC status on the RRL from January 14, 2013, to April 21, 2014.  At that time, Lyons was released from AC, and returned to general population at SCI-Dallas.  Lyons was subsequently removed from the RRL on June 9, 2015, following the recommendation of the PRC.

### C.     Lyons's Grievance History at SCI-Dallas

The Pennsylvania Department of Corrections maintains three separate formal policies that inmates can use to present grievances administratively.  DC-ADM 801, 802 and 804.  Two of these policies—ADM 802 and 804--are implicated in this case.  DC-ADM 802 was amended effective on June 7, 2011, to be the exclusive procedural vehicle an inmate in AC has to pursue any issue concerning placement, duration, conditions or other circumstances related to AC-housing status.  (Doc. 80, Def. Appendix at B, Declaration of Joseph DuPont; Appendix at A, DC-ADM 802 effective June 7, 2011, with amendments, pp. 2-4.) Following its effective date, the DC-ADM 802 also applied to any conditions of AC confinement that previously would have fallen under the ambit of DC-ADM 804, the general grievance policy that inmates utilize for filing administrative grievances about other aspects of their confinement.  (Appendix at B, DuPont Decl.; Appendix at A, DC-ADM 802, pp. 2-4.)

An inmate in AC confinement may appeal issues related to his restricted confinement to the Program Review Committee (PRC), then to the Facility Manager, and then to the Chief Hearing Examiner.  (Appendix at A, DC-ADM 802, pp. 2-1, 2-2.)  An inmate's status in AC custody is periodically reviewed. (*Id.*, p. 2-3.)  An inmate's status in AC on the RRL is reviewed annually.  (*Id.*, p. 2-4.)  Inmates in AC custody are afforded fewer privileges than they would be in

12

general population, though they may become eligible for radio and television privileges after a period of time.  (*Id.*, pp. 3-1, 3-2.)

The defendants have provided a declaration from Joseph Dupont, the Chief Hearing Examiner for the Department of Corrections, who supervises the DOC's hearing examiners and is also responsible for reviewing and adjudicating inmate final appeals from decisions or issues relating to administrative custody in accordance with the DC-ADM 802 policy.   In Mr. Dupont's declaration, he represents that a search of the DOC's DC-ADM 802 records in the Office of the Chief Hearing Examiner reveals that Lyons did not properly appeal to final review any 802 grievances during the time period relevant to this action.  (Def. SMF ¶¶55-56; Appendix at B, Dupont Decl.)

In addition to the DC-ADM 802, which applies only to inmates in AC status, the Department of Corrections also provides the DC-ADM 804, which provides a separate administrative procedure through which inmates can seek resolution of general grievances.  (Appendix at F, Declaration of Helen Shambaugh; Appendix at E, DC-ADM 804, effective December 8, 2010 with amendments.)   In cases where attempts at informal resolution of grievances are unsuccessful, the DC-ADM 804 provides a three-step process for addressing and resolving disputes:  an initial grievance at the institutional level, an appeal to the Facility Manager, and an

appeal to final review with the Secretary's Office on Inmate Grievances and Appeals (SOIGA). (*Id.*)

Helen Shambaugh works in the SOIGA, and in her capacity there reviews and disseminates inmate correpsondence to staff in order to obtain a response; she reviews grievance appeals to make sure that they are in accordance with DOC policy; she informs inmates of what needs to be done with their appeals before they are accepted for final review; and she reviews all grievances to see if inmates properly appealed to final review.  (Appendix at F, Shambaugh Decl.)   In her capacity, Ms. Shambaugh is a records custodian for all grievance appeals submitted. (*Id.*)

At the request of counsel in this case, Ms. Shambaugh reviewed Lyons' grievance records filed at SCI-Dallas from September 2011 through December 2013.  Ms. Shambaugh represents that during that time Lyons filed 103 grievances. (*Id.*; Appendix at H, Grievance Records.)  Lyons appealed 19 of these grievances through final review with SOIGA, of which only three are potentially relevant to the claims made in this lawsuit.   Those three grievances are Grievance Nos. 393956, 411095, and 412217.  (Appendix at H, Grievance Records.)  Two of these grievances allege that defendants Mahally and Mooney discriminated or retaliated against Lyons by prohibiting him from having a television in his cell.   Another

grievance alleges that Superintendent Walsh discriminated against Lyons by denying him a word processor.

The defendants moved for summary judgment on Lyons's remaining claims on October 19, 2015. The motion was not fully briefed until April 8, 2016, when the plaintiff filed his counterstatement of material facts. The defendants declined to file a reply brief. In short, the defendants have moved for summary judgment on the grounds that Lyons failed to exhaust any of his claims properly prior to bringing suit, and thus the claims are barred under the PLRA. Additionally, the defendants argue that the remaining claims fail factually and on the legal merits. We agree.

## III.   <u>DISCUSSION</u>

### A.   **Rule 56 – The Legal Standard**

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. Rule 56(a). Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and for which a trial would be "an empty and unnecessary formality." *Univac Dental Co. v. Dentsply Int'l, Inc.*, No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010). The substantive

law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Id.* at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. - *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. <u>Anderson</u>, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the nonmoving party

and more than some metaphysical doubt as to the material facts. *Id.* at 252; *see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In making this determination, the court must "consider all evidence in the light most favorable to the party opposing the motion." *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 794 (3d Cir. 2007).

It is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." *Thimons v. PNC Bank, NA*, 254 F.App'x 896, 899 (3d Cir. 2007) (citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported .., an adverse party may not rest upon mere allegations or denial*." Fireman's Ins. Co. Of Newark NJ v. DuFresne*, 676 F.2d 965, 968 (3d Cir. 1982), *see Sunshine Books, Ltd. v. Temple University*, 697 F.2d 90, 96 (3d Cir. 1982)." [A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." *Lockhart v. Hoenstine*, 411 F.2d 455, 458 (3d Cir. 1969). Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985)(citing *Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir. 1981)).

### B.    The PLRA Exhaustion Requirement

The Prison Litigation Reform Act, 42 U.S.C. § 1997 ("PLRA") requires that prisoners present their claims through an administrative grievance process prior to seeking redress in federal court.  Specifically, the Act provides that:

> No action shall be brought with respect to prison conditions under [§ 1983], or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  In accordance with the PLRA, prisoners must comply with exhaustion requirements with respect to any claim that arises in the prison setting, regardless of the type of claim asserted, or the relief sought.  *See Porter v. Nussle*, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."); *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001) ("[A]n inmate must exhaust irrespective of the forms of relief sought and offered through administrative avenues.").

As the statute's language makes clear, the exhaustion of available administrative remedies *prior* to filing suit is mandatory.  *See Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000) ("[I]t is beyond the power of this court – or any other – to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis.") (quoting *Beeson v. Fishkill Corr. Facility*,

28 F. Supp. 2d 884, 894-95 (S.D.N.Y. 1998)).   Whether an inmate has exhausted administrative remedies is a question of law that is to be determined by the court, even if that determination requires the resolution of disputed facts.   *See Small v. Camden County*, 728 F.3d 265 (3d Cir. 2013); *see also Drippe v. Tobelinski*, 604 F.3d 778, 781 (3d Cir. 2010).

Moreover, the exhaustion requirement of the PLRA is one of "proper exhaustion."   *Woodford v. Ngo*, 548 U.S. 81, 84 (2006).   Failure to comply with the procedural requirements of the available grievance system will result in a claim being deemed procedurally defaulted.   *Id.* at 90; *Spruill v. Gillis*, 372 F.3d 218, 227-32 (3d Cir. 2004).   An inmate cannot circumvent the PLRA's exhaustion requirement by failing to properly exhaust the prison's administrative review process, or by waiting until such remedies are no longer available to him. *Woodford*, 548 U.S. at 95.   However, if an inmate shows that the actions of prison officials directly caused the inmate's procedural default of a grievance, the inmate will not be held to strict compliance with the exhaustion requirement.   *Brown v. Croak*, 312 F.3d 109, 112-13.   Likewise, "[w]here [the inmate] failed to receive even a response to the grievances addressing the . . . incidents, much less a decision as to those grievances, the [administrative remedy] process was unavailable to him." *Small v. Camden County*, 728 F.3d 265, 271 (3d Cir. 2013).

### C.    The DOC Administrative Remedy Process

As discussed above, the DOC maintains two separate but applicable grievance procedures that apply to Lyons's claims.  First, DC-ADM 802 is the policy that inmates must use to grieve complaints relating to AC custody and confinement.  DC-ADM 804 is the general grievance provision allowing for inmates to file grievances regarding general issues that inmates have with their confinement.  Both of these policies are built around three-step processes that require inmates to file initial grievances, followed by appeals to the Facility Manager, followed by a final appeal either to the Chief Hearing Examiner or SOIGA.

### D.    Lyons Failed to Fully Exhaust Any of the Claims in this Case

Although the court recognizes that the different grievance policies that the DOC utilizes depending upon an inmate's custody classification presents challenges for inmates, the fact of the matter is that Lyons knew about both policies and was abundantly familiar with the grievance process.  Lyons testified that he understood the requirements of the policies under both 802 and 804. (Appendix at I, Deposition of Eric Lyons at pp. 26-27.)  Nevertheless, the undisputed evidence shows that Lyons never used the procedure prescribed by DC-ADM 802 to grieve his complaints over his AC custody status.  Indeed, although Lyons filed more than 100 grievances during his time at SCI-Dallas before

initiating this lawsuit, he exhausted only 19 of these, and only three of those 19 have any possible relevance to the claims in this case. Two of those that were fully processed were dismissed because Lyons failed to adhere to DOC policy regarding the proper course of exhaustion under DC-ADM 804. Thus, we are presented with a situation in which it appears undisputed that Lyons never fully and properly grieved his continued AC placement through the appropriate administrative process, a failure which would bar this claim under the PLRA. Lyons argues at length that nobody ever corrected him about his erroneous use the various grievance procedures, and he contends that he should not be penalized for attempting to bring his grievances to the knowledge of prison officials. Lyons is essentially arguing that the defendants are relying on form over substance, and he urges the court to avoid using an exacting interpretation of the DOC's policies. Although the court appreciates Lyons's argument to a point, and although the defendants have waited a considerable period of time before presenting evidence to show that Lyons's claims should be dismissed for failure to exhaust, we do not find that this delay precludes assertion or consideration of the defendants' motion.

The Third Circuit has cautioned that courts should be "reluctan[t] to invoke equitable reasons to excuse [an inmate's] failure to exhaust as the statute requires." *Davis v. Warman*, 49 F. App'x 365, 368 (3d Cir. 2002). Furthermore, an inmate's sense of futility of a grievance, or the grievance process, does not excuse

compliance with the law. *Nyhuis v. Reno*, 204 F.3d 65, 72 (3d Cir. 2000). There is no indication in the record that any prison official interfered with Lyons's rights to file grievances, and the record instead suggests quite the opposite: Lyons availed himself of at least one of the grievance processes more than 100 times while at SCI-Dallas, though he filed only a fraction of these to final review. Further, it seems undisputed that Lyons persisted in following an inappropriate grievance path when protesting these matters. Since an inmate's failure to fully and properly exhaust will only be excused "under certain limited circumstances," *Harris v. Armstrong*, 149 F. App'x 58, 59 (3d Cir. 2005), including where "he was misled or that there was some extraordinary reason he was prevented from complying with the statutory mandate," *Davis v. Warman*, 49 F. App'x at 368; and because Lyons clearly knew of the two policies and their requirements yet failed to follow them perhaps due only to mistake or inattention on his part, we are unable to find legal grounds for excusing his failure to complete the process. This is particularly true here, since Lyons – through his prior litigation before this court – has been put on ample notice regarding the requirements of both DC-ADM 802 and DC-ADM 804, *see Lyons v. Beard*, Civil No. 3:CV-07-2278, 2009 U.S. Dist. LEXIS 19433, 2009 WL 604139 (M.D.Pa. March 9, 2009) (dismissing case where Lyons failed to exhaust claims under DC-ADM 804 even while in the SMU). Accordingly, we find on the unique and undisputed facts of this case that Lyons has not presented

any issue that would excuse his failure to fully exhaust his administrative remedies prior to bringing this latest lawsuit.

> **E.     Even if Lyons Had Exhausted, Defendants are Entitled to Summary Judgment on His Claims Relating to His Former Placement on the RRL**

To the extent that Lyons is attempting to sue defendants Klopotoski, Demming, Mahally and Mooney for his prolonged assigned to the RRL and AC custody, we find that the claims are both moot and unsupported. As the defendants have noted, Lyons is no longer in the RHU on AC or on the RRL. Accordingly, to the extent Lyons is seeking injunctive relief relating to this former custody status, his claim has been rendered moot. *See, e.g., Sutton v. Rasheed*, 323 F.3d 236, 248 (3d Cir. 2003); *Abdul-Akbar v. Watson*, 4 F.3d 195, 206 (3d Cir. 1993); *Thomas v. SCI-Camp Hill*, 371 F. Supp. 2d 640 (M.D. Pa. 2005). Even if Lyons were seeking damages on the grounds that his prolonged confinement in the RHU implicated a due process interest, the record is undisputed that Lyons received periodic reviews by the PRC, and that his status on the RRL was reviewed annually. The record is also clear that an inmate cannot be removed from the RRL without the authorization given by the Secretary of the Department of Corrections – thus, none of the named defendants were authorized to remove Lyons from the RRL in any event.

Finally, being placed on the RRL does not, by itself, implicate a constitutional right. *See Huertas v. Sec'y Pa. Dep't of Corr.*, 533 F. App'x 64 (3d Cir. 2013). It is true that extended placement in AC housing, and extended segregation, may be considered an atypical hardship that implicates a protected liberty interest. *See Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000) (relying on *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). However, even if an inmate has a protected liberty interest, what he is entitled to is periodic review of his status: *Shoats* holds that a prisoner who is placed in extended administrative custody is entitled to an "'informal, nonadversary review at which the prisoner has the opportunity to state his views'", and that such a review satisfies due process. *Shoats*, 213 F.3d at 144 (quoting *Hewitt v. Helms*, 459 U.S. 460, 476 (1983)). To the extent that Lyons is suggesting *Sandin* or *Shoats* require his release, or proscribes confinement within AC housing, he overstates the holding of these cases.

The defendants, in turn, have come forward with evidence showing that prior to his release from AC and the RRL, Lyons was afforded periodic and regular reviews of his custody level and status. Lyons has not effectively disputed these facts. In *Huertas* the Third Circuit instructed that

> [an inmate] may disagree with prison officials' evaluation that ongoing administrative custody is justified by continuing security concerns, but he must show that the periodic reviews he receives are constitutionally inadequate . . . .

24

*Huertas*, 533 F. App'x at 67.  Lyons has not done so here, and the absence of evidence to contradict the defendants' showing on this point on this issue compels judgment in the defendants' favor on this particular claim.

### F.   Lyons's Equal Protection Claims Fails Factually

Lyons has also sued defendants Walsh, Demming, Mahally and Mooney for allegedly treating him differently than other similarly situated inmates by denying him access to his television, radio and a typewriter while he was in the AC on the RRL.  The defendants previously moved to dismiss this claim, but in doing so never squarely addressed the claim or Lyons's allegations in support of it.

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV.  This is not a requirement that all persons be treated identically, but is instead a general direction that similarly-situated persons be treated alike.  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  An equal protection claim may be brought by a "class of one," where a plaintiff alleges that he has been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam); *see also Overly v. Garman*, 599 F. App'x 42 (3d Cir. 2015) (holding that in order to establish a class-of-one equal protection claim a plaintiff must show that (1) the

25

defendants treated him differently than others similarly situated, (2) the defendants did so intentionally, and (3) there was no rational basis for the difference in treatment).

The defendants argue that the facts simply do not provide any plausible or substantive support for Lyons's claims.  Thus, the defendants assert without contradiction that Lyons was the only inmate with a typewriter in his unit, and thus it is impossible to glean from this uncontroverted fact how prison officials' decision to limit Lyons's access to his typewriter could support a constitutional claim based on a class-of-one theory.  We agree.  Lyons has not identified other "similarly situated" individuals at SCI-Dallas who were treated differently than he was with respect to being deprived of a typewriter, and thus Lyons has not supported his claim in the most fundamental sense:  he has not shown that he was actually treated differently than any other inmate with respect to his typewriter for the simple reason that he appears to have been the only inmate in a similar custodial setting who owned a typewriter.  This undisputed fact undermines Lyons's complaint insofar as it is framed as an equal protection claim.

Similarly, Lyons has failed to support his class-of-one claims with respect to other items of personal property that he was denied while on AC custody status after arriving at SCI-Dallas, and particularly after he had served his DC time. Lyons even appears to abandon his class-of-one theory, in favor of complaining

more generally that the defendants purposefully kept him in restricted housing in order to justify restricting his access to his personal property such as a radio and television set.  Lyons really has not supported this claim, other than through his own self-serving speculation, and it has been acknowledged in this and other cases that inmates within administrative custody sometimes have less generous use and enjoyment of personal property and other privileges because of the restricted nature of their housing.  *See Carter v. Beard*, No. 1:CV-10-1543, 2012 U.S. Dist. LEXIS 57209, *6-7, 2012 WL 1414446 (M.D. Pa. Apr. 24, 2012) ("Inmates housed in AC custody do not have the same privileges as inmates housed in general population.   For AC inmates, greater restrictions are placed on the availability of radios, televisions, telephone calls, personal property, visitation, access to the law library, clothing, recreation, and more, when compared to those privileges enjoyed by inmates housed in general population.").  Lyons does not really dispute this, although he does argue that there came a point where the DOC policy was changed to permit inmates in the AC who were not serving disciplinary time could be considered eligible to have their personal property with them notwithstanding their different custody status.  Regardless of this change in prison policy, however, Lyons has not come forward with facts to show that the defendants intentionally targeted him with different treatment; instead, it appears that at SCI-Dallas Lyons went for a period where he did not have access to his

radio, television and other property, but that he eventually earned back the right to have these articles with him in his cell and, indeed, eventually was removed from the AC. Although there may be cases where such property deprivation may support a claim under the Equal Protection Clause under similar circumstances, Lyons has not adduced sufficient facts to show that he was treated differently from other inmates in the AC at SCI-Dallas, or that he was intentionally treated differently, or that there was no rational reason for any alleged difference in treatment.

### G. Lyons's Retaliation Claims Also Fail

Finally, Lyons has also sued defendants Kloptoski, Walsh, Mahally, Mooney and Damore for First Amendment retaliation, alleging that these defendants each independently denied him access to property in retaliation for grievances that Lyons filed. Lyons's claims against these particular defendants under this theory fail on the facts, since Lyons has not come forward with actual evidence to show that these defendants even subjected Lyons to an adverse consequence, much less that they did so out of a retaliatory motive.

In order to state a claim for First Amendment retaliation in the prison context, an inmate must show (1) that he engaged in constitutionally protected conduct, (2) that he suffered adverse action at the hands of prison officials, and (3) his constitutionally protected conduct was a substantial motivating factor in the

defendants' conduct.  *Carter v. McGrady*, 292 F.3d 152, 158 (3d Cir. 2002).  With respect to the obligation to demonstrate that he suffered an adverse action, a plaintiff must show that he suffered action that "was sufficient to deter a person of ordinary firmness from exercising his rights."  *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000).  Examples of adverse actions that have, in certain cases, been found to support a retaliation claim include filing false misconduct reports, *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003), transferring a prisoner to another prison, *Rauser v. Horn*, 241 F.3d 330, 333-34 (3d Cir. 2001), and placing a prisoner in administrative custody, *Allah*, 229 F.3d at 225.

The third element to a retaliation claim is that the inmate-plaintiff show a causal link between the exercise of a constitutional right and the adverse action taken against the prisoner.  *Rauser*, 241 F.3d at 333-34.  To establish this third component, Lyons must make an exacting showing:

> To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link.  *See Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503-04 (3d Cir. 1997); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920-21 (3d Cir. 1997).  In the absence of that proof the plaintiff must show that from the "evidence gleaned from the record as a whole" the trier of fact should infer causation.  *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000).

*Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

Moreover, when examining these causation issues, we are specifically admonished that:

> A court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate. Consequently, a putative plaintiff by engaging in protected activity might be able to insulate himself from actions adverse to him that a public actor should take. The point we make is not theoretical as we do not doubt that public actors are well aware that persons disappointed with official decisions and actions frequently bring litigation against the actors responsible for the decisions or actions in their individual capacities, and the actors surely would want to avoid such unpleasant events. Thus, it would be natural for a public actor to attempt to head off a putative plaintiff with the unwarranted expenditure of public funds. Courts by their decisions should not encourage such activity and, by enforcing the requirement that a plaintiff show causation in a retaliation case, can avoid doing so as they will protect the public actor from unjustified litigation for his appropriate conduct. In this regard we recognize that often public actors such as those in this case must make a large number of decisions in charged atmospheres thereby inviting litigation against themselves in which plaintiffs ask the courts to second guess the actors' decisions.

*Id*. at 267-68.

Mindful of these concerns, courts have in the past carefully scrutinized inmate claims of retaliation premised solely on circumstantial proof of a temporal proximity between the plaintiff's conduct and allegedly retaliatory acts.  Indeed, this court has spoken directly to the issue of what must be shown to state a valid complaint in this factual context, noting that:

> To establish the causation element of a retaliation claim, a plaintiff must prove that his or her participation in a protected activity motivated the defendant to perform the retaliatory act.  *Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir.2002); *Meenan v. Harrison*, Civ. A. No. 3:03-CV-1300, 2006 U.S. Dist. LEXIS 20044, 2006 WL 1000032, at *4 (M.D. Pa. Apr. 4, 2006) (observing that a plaintiff must demonstrate that the exercise of First Amendment rights "played some substantial role" in the defendant's action).    The temporal proximity of a retaliatory act to a plaintiff's exercise of his or her First Amendment rights is probative, but not dispositive, of the causation element.  *Estate of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir.2003); *see also Kachmar v. Sungard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir.1997) (stating that "temporal proximity merely provides an evidentiary basis from which an inference can be drawn").    For temporal proximity alone to establish causation, the "timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."  *Marasco*, 318 F.3d at 512 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir.1997)) . . .  [T]he Third Circuit Court of Appeals has suggested that a temporal proximity of two days is sufficient to establish causation, *see Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 & n. 5 (3d Cir.2000), whereas a temporal proximity of ten days is sufficient to establish causation only when accompanied by other

> evidence of . . . wrongdoing, *Shellenberger v. Summit Bancorp, Inc.,* 318 F.3d 183, 189 (3d Cir.2003). This suggests that the temporal proximity must be measured in days, rather than in weeks or months, to suggest causation without corroborative evidence.

*Conklin v. Warrington Twp.*, No. 06-2245, 2009 U.S. Dist. LEXIS 36256, 2009 WL 1227950, *3 (M.D. Pa. April 30, 2009).

The defendants do not quarrel with Lyons's assertion that he has, on numerous occasions, engaged in protected conduct by filing lawsuits and grievances. They do dispute whether they took any retaliatory action in response to this protected activity. Lyons has claimed that Klotpotoski retaliated against him by denying him his television, but the defendants succinctly point out that (1) the PRC, and not Klopotoski, decided whether or not Lyons could have his television and (2) Lyons was eventually provided with his television, but later lost it when he was adjudicated guilty of other prison infractions and as part of an informal resolution of these charges. Lyons does not effectively dispute these facts, and it is difficult to perceive how Klopotoski could be held liable for engaging in retaliatory conduct when in fact Klopotoski did not have the authority to commit the retaliatory act that Lyons alleges.

Likewise, Lyons has claimed that defendants Mahally and Mooney retaliated against Lyons after he filed grievances in May 2012. Once again, the claim turns on Lyons's desire for his television set, and he claims that these defendants

32

prevented him from having his TV out of retaliatory animus.  The defendants again note the impossibility of this claim, since Lyons was already deprived of his television at the time he claims that Mahally and Mooney retaliated against him.  It thus is difficult to perceive how these defendants' non-action of maintaining the status quo with respect to Lyons's personal property could in any way be considered "retaliation".  We find that Lyons has failed to support this claim, and the apparently undisputed facts regarding Lyons's separation from his TV and the procedural saga he engaged in for its return do not support a claim for First Amendment retaliation against two defendants who did not actually deprive him of his television in the first place.

Lyons claims that defendant Walsh, the Superintendent at SCI-Dallas, retaliated against him by upholding a first-level grievance response.  Walsh upheld the grievance response because it was believed, at that time, that Lyons's could not receive any channels in his AC cell since it had no access to cable and because officials did not believe that an antenna would solve the problem.  Lyons has no plausible or substantial evidence to show that Walsh's affirmance of a first-level grievance response upholding the decision to restrict Lyons from having his television in his cell had any retaliatory motive behind it.

Finally, Lyons has attempted to bring a claim for retaliation against defendant Damore, apparently on the grounds that Damore intercepted

correspondence that Lyons tried to send to Klopotoski or other staff, and responded in their stead.   Lyons has construed this action – which is apparently part of Damore's official duties as a staff assistant – as somehow interfering with Lyons's right of access to the grievance system.   He also contends that Damore retaliated by causing a misconduct to be issued after Lyons quit his job at the prison, something that Lyons asserts – without any evidence to adorn the claim – was motivated by retaliatory animus.   Even assuming that Lyons's act of writing a letter to Klopotoski or Wetzel was protected First Amendment activity, it is impossible to perceive how Damore's act of responding to the letter in accordance with his job duties could be considered retaliatory.   Lyons, apparently by pure conjecture, believes that Damore had something to do with the decision of a Corrections Officer to issue Lyons a misconduct approximately one month after Damore responded to Lyons's letter, but there is absolutely no evidence to show that Damore had any personal involvement with the decision to issue this misconduct, and Lyons's own unsupported conjecture on this point is wholly insufficient to support this claim.

Finally, as noted previously, not only do Lyons's retaliation and equal protection claims against these defendants lack a factual foundation, they are all

unexhausted and properly subject to dismissal for that reason as well, aside from their lack of evidentiary basis.[7]

## IV.   <u>RECOMMENDATION</u>

Accordingly, for the foregoing reasons, IT IS HEREBY RECOMMENDED THAT the defendants' motion for summary judgment (Doc. 75.) be GRANTED and the case marked closed.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The briefing requirements set forth in Local Rule 72.2 shall apply.  A judge shall make a de novo determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.

---

[7]  At times in the defendants' brief, they suggest that Lyons is attempting to pursue still other claims, such as a purported denial of access to the courts based on defendant Walsh persuading Lyons to dismiss his earlier lawsuit without prejudice.   The court finds it unnecessary and ill-advised to analyze each of these possible claims, because it is clear from the record that they are unexhausted.   We do note, however, that Lyons's access-to-courts claim seems highly dubious, since it was he who sought to have his earlier lawsuit dismissed without prejudice.   That dismissal in fact occurred, and nothing about that action served to prevent Lyons from re-filing his claims if he believed he had a basis for doing so.   Indeed, this lawsuit is proof that Lyons had access to the courts, and nothing about his earlier act of having his lawsuit dismissed without prejudice – or what may have motivated him to follow that course – is supportive of a claim that any of the named defendants prevented Lyons from exercising his First Amendment right to petition for redress of grievances, which is a right that Lyons has had no trouble exercising.

The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 3d day of June 2016.

*/s/  Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge